UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM ZIMMER,

       Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.
_____/

Hon. Ellen S. Carmody

Case No. 1:12-cv-48

## OPINION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. On April 24, 2012, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment. (Dkt. #10).

Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 32 years old on his alleged disability onset date. (Tr. 113). He successfully completed high school and worked previously as a general laborer, meat packer, and welder. (Tr. 25, 130, 145-46).

Plaintiff applied for benefits on April 8, 2008, alleging that he had been disabled since February 3, 2005, due to back problems, chronic nerve pain, and depression. (Tr. 113-16, 143). Plaintiff's applications were denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 68-112). On February 18, 2010, Plaintiff appeared before ALJ Gary Suttles, with testimony being offered by Plaintiff and vocational expert, Wallace Stanfill. (Tr. 34-65). In a written decision dated March 12, 2010, the ALJ determined that Plaintiff was not disabled. (Tr. 12-27). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-5). Plaintiff subsequently initiated this pro se appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On March 17, 2005, Plaintiff was examined by physician's assistant Jason Peterman. (Tr. 221-22). Plaintiff reported that he injured his back on February 3, 2005, while "pulling some

3

heavy material on a cart" at work. (Tr. 221). Plaintiff reported that he was experiencing "posterior lateral leg pain with numbness extending down into his great toe." (Tr. 221). Plaintiff reported that he "has attempted home exercises as well as a steroid trial, but was unable to tolerate this due to side effects." (Tr. 221). Straight leg raising was "positive" on the left and "mild[ly] positive" on the right. (Tr. 221). An MRI of Plaintiff's lumbar spine revealed "a leftward oriented disc herniation at the L5-S1 level directly compressing the nerve root." (Tr. 222).

On April 25, 2005, Plaintiff underwent back surgery performed by Dr. Christopher Marquart. (Tr. 378-79). Specifically, the doctor performed a "left L5-S1 lumbar microdiskectomy with microlateral recess decompression." (Tr. 378). On June 27, 2005, Dr. Marquart performed a second "left L5-S1 lumbar microdiscectomy" to remove a disc fragment. (Tr. 380-81).

Treatment notes dated July 7, 2005, indicate that Plaintiff is "doing fairly well at this time maybe somewhat better." (Tr. 227). Treatment notes dated July 20, 2005, indicate that Plaintiff is "doing maybe a little bit better still in a fair amount of pain really not ready to even talk about returning to light duty" work. (Tr. 228). Treatment notes dated August 16, 2005, indicate that Plaintiff was "still having difficulties in the left leg about the same and also he's developed right leg difficulties getting progressively worse down the posterior lateral leg similar to what he's experiencing on the left side." (Tr. 229). On August 16, 2005, Physician's Assistant Jason Peterman reported that Plaintiff is "quite limited in his activities at this time" and "really can't do anything more [than be] on his feet for an hour and a half and knows that he would not be able to tolerate any type of work at this time." (Tr. 229).

X-rays of Plaintiff's lumbosacral spine, taken on August 31, 2005, revealed "mild disc space narrowing at L4-5," but "the vertebral body heights and disc spaces are otherwise well

4

maintained." (Tr. 408). An MRI examination of Plaintiff's lumbosacral spine, performed the same day, revealed "no residual or recurrent disc herniation" and "no new disc herniation." (Tr. 410-12).

On September 15, 2005, Plaintiff was examined by Dr. Harrison Johnson. (Tr. 236). Plaintiff reported that the numbness and tingling he had been experiencing in his right lower extremity "has now almost resolved." (Tr. 236). With respect to the numbness and tingling Plaintiff had been experiencing in his left lower extremity, Plaintiff reported that "he still has some radiation down to approx[imately] his knee as opposed to all the way down to his toes." (Tr. 236). Plaintiff reported that he "still has problems with standing and sitting for too long a period and walking also aggravates his pain." (Tr. 236). Dr. Johnson noted that Plaintiff "showed much improvement from his last visit in mid August" and "now has much better [range of motion] of his spine." (Tr. 236).

The doctor concluded that Plaintiff should begin a formal physical therapy program "to work on strengthening of the lumbar spinal muscles." (Tr. 236). Dr. Johnson also reported that Plaintiff could return to work subject to the following restrictions: (1) no lifting more than 20 pounds; (2) no repetitive movements of the lumbar spine such as bending, extending, and twisting; and (3) Plaintiff must be allowed to have "frequent position changes at work." (Tr. 237). The doctor also reported that Plaintiff should return to work "on a graduated program" pursuant to which he would begin by working "4 hours a day for the first week and then adding an hour to the schedule every week which would bring him up to an 8 hour day in 4 weeks." (Tr. 237).

On October 26, 2005, Plaintiff was examined by Dr. Johnson. (Tr. 241). Plaintiff reported that his back pain had increased, but also that he had recently missed five scheduled physical therapy sessions. (Tr. 241). Plaintiff was instructed to resume physical therapy. (Tr. 241). The doctor reiterated that Plaintiff could return to work the following week subject to the

5

aforementioned limitations. (Tr. 241). On November 8, 2005, Dr. Johnson reported that Plaintiff "is continuing to attend PT although on an inconsistent basis." (Tr. 245). The doctor stressed to Plaintiff the importance of consistently attending physical therapy if he wished to "improv[e] his chronic pain." (Tr. 245). On December 29, 2005, Dr. Johnson indicated that Plaintiff could return to work on January 16, 2006, subject to the following restrictions: (1) no lifting more than 25 pounds and (2) no repetitive lifting, bending or twisting. (Tr. 250).

On January 18, 2006, Plaintiff was examined by Dr. Johnson. (Tr. 251). Plaintiff reported that he had returned to full-time work consistent with the doctor's limitations. (Tr. 251). Plaintiff reported that so long as he was "compliant with his restrictions" he only experienced "some increased soreness at the end of the day." (Tr. 251). On February 1, 2006, Plaintiff reported to Dr. Johnson that his back pain "is only 4 out of 10." (Tr. 254).

On March 7, 2006, Plaintiff was examined by Dr. Johnson. (Tr. 257). Plaintiff reported that he had begun experiencing numbness, tingling, and pain radiating down both lower extremities. (Tr. 257). Plaintiff reported that because of this pain he was no longer able to work. (Tr. 257). A physical examination revealed that Plaintiff "has functional lower extremity strength," but "subjective complaint of numbness and tingling all the way down his lower extremities, some mild tenderness to palpation over his low back and also over the piriformis area." (Tr. 257). Dr. Johnson concluded that Plaintiff "may benefit from behavioral therapy or psychology to evaluate that aspect of his pain." (Tr. 257).

On April 14, 2006, Plaintiff participated in an MRI examination of his lumbar spine the results of which revealed: (1) postoperative changes at L5-S1, but "no recurrent disc herniation"; (2) a "moderate" amount of foraminal stenosis at L5, but "no significant central canal stenosis"; and

6

(3) "otherwise, unremarkable lumbar spine study." (Tr. 268, 270).

On May 25, 2006, Dr. Johnson reported that Plaintiff could "work 4 hours a day" subject to the following restrictions: (1) no lifting more than 25 pounds; (2) no repetitive lifting, bending, or twisting; and (3) Plaintiff may also need to perform certain prescribed stretches during breaks. (Tr. 264). The doctor also reported that Plaintiff could increase his work day by two hours each week building up to a full 8 hour work day. (Tr. 264).

X-rays of Plaintiffs lumbar spine, taken on November 27, 2006, were "negative" with "no evidence of lumbar compression deformities" or "significant degenerative change." (Tr. 393).

On January 29, 2007, Plaintiff was examined by Dr. Howard Leroux. (Tr. 311-12). Plaintiff reported that he was experiencing persistent lower back pain and was obtaining "ineffective" pain relief with his current medication. (Tr. 311). An examination of Plaintiff's spine revealed the following:

> Inspection reveals no abnormality. No kyphosis. No scoliosis. Positive for posterior tenderness. No paravertebral spasm from L2 to S1. Normal lateral flexion. Normal rotation. Lumbar angle is 60 degrees. Lumbar extension is 20 degrees.

(Tr. 311-12). Plaintiff exhibited "normal musculature" with "no skeletal tenderness or joint deformity." (Tr. 312). Plaintiff's medication regimen was modified. (Tr. 312).

On March 27, 2007, Plaintiff was examined by Dr. Sam Ho. (Tr. 661-63). Plaintiff reported that he was experiencing lower back pain which radiated into both lower extremities. (Tr. 661). Plaintiff reported that his pain ranges from 5/10 to 10/10 and was presently 7/10. (Tr. 661). The results of a physical examination revealed the following:

> When I saw [Plaintiff] today, he reported to be 5'11" tall and weighed about 169 pounds. He was able to walk without support. He

7

> demonstrated the ability to stand on one lower extremity at a time and come to his toes 10 times in either lower extremity. During examination of the lumbosacral spine, he forward flexed to 45 degrees, extended to 30 degrees, rotation bilaterally to 30 degrees, lateral tilting 45 degrees. The pain in the lumbar region extending to the lower extremities was reported to occur while he performed forward flexion, extension, as well as rotation. Lateral tilting did not produce any radicular symptoms. He stated there were mild radiating symptoms in his right side but only to the buttock region. Sensory examination was described to have no deficit at the anterior aspect of the thigh; however upper lumbar region including both buttocks, bilateral calf, thigh, foot were reported to have reduced pinprick sensation. Deep tendon reflexes in both knees and right ankle were 2+, left ankle reflex was absent. Straight leg raising in the sitting position was 90 degrees. Straight leg raising in the supine position bilaterally was to 30 degrees. However I was able to flex his knees against his chest wall without pain symptoms and straight leg raising in extended leg was to 45 degrees on the left.

(Tr. 662).

Dr. Ho also conducted a nerve conduction study, the results of which were "within normal range" and "did not note any abnormalities." (Tr. 662-63). The doctor concluded that Plaintiff's "clinical presentation did suggest S1 radiculopathy on the left," but "I cannot offer an explanation regarding the symptoms for the remainder of the lower extremity since sensory deficit distribution is nonphysiological." (Tr. 663).

On March 27, 2007, Plaintiff participated in an MRI examination of his lumbar spine, the results of which revealed the following:

> Lumbar alignment is normal. Mild endplate degenerative signal change is present at L5-S1. Marrow signal is otherwise normal. The conus is normal in appearance and location. No abnormality is present at L2-3, L3-4 or L4-5. At L5-S1, left laminectomy changes are noted. There is moderate disc space narrowing and T2-weighted signal loss. Enhancing scar is seen within the left L5-S1 foramen as well as along the left side of the thecal sac at L5-S1 level. Recurrent disc herniation and/or mass effect however, is not seen. There is no

8

central stenosis.

(Tr. 325-26).

On September 14, 2007, a "Medical Discharge Summary" was issued by RehabPros. (Tr. 327-29). The report indicates that Plaintiff "was seen for his clinic assessment on 06/05/2007 and for eight subsequent treatment visits between 08/06/2007 and 09/06/2007." (Tr. 327). The report noted however that "over that course of time, the patient also canceled or rescheduled seven additional visits." (Tr. 327). Over the course of his treatment, Plaintiff was instructed in symptom control, flare-up management strategies, pacing, a home exercise program of lower extremity and low back stretching, basic level stabilization, general conditioning, and management of postural stresses. (Tr. 327). It was noted however that, "it was difficult to progress the patient's stabilization exercise program and cardiovascular exercise program secondary to his frequent missed appointments." (Tr. 327).

The report notes that on September 6, 2007, Plaintiff was able to lift 20 pounds at waist level and push/pull up to 30 pounds. (Tr. 327). It was also noted that on that particular date, Plaintiff reported "an increase in back pain following playing with a friend's dog." (Tr. 327). Plaintiff reported experiencing "minimal difficulty with activities such as dusting or vacuuming, cooking, washing or drying dishes, or mowing the lawn." (Tr. 327-28). Plaintiff reported experiencing "moderate difficulty with showering, lower body dressing, cleaning the bathroom, raking or shoveling, moderate to significant difficulty with getting in and out of bed or in and out of his vehicle, and significant difficulty with sleeping, grocery shopping, driving, childcare, and going up or down stairs." (Tr. 328). With respect to the psychological component of the rehabilitation process, the report notes the following:

9

> Mr. Zimmer was seen for three individual sessions between 08/16/2007 and 09/06/2007. He initially presented with multiple psychological goals and significant distress, including low perceived control over the pain, high perceived disability, pain avoidance and pain anxiety, pain catastrophizing, depression and low acceptance of his chronic pain condition, all of which had been interfering with his mood and functioning. Throughout each of these three sessions, attempts were made to change Mr. Zimmer's focus from pain relief to functional rehabilitation. Although he participated and listened while in session, he did not turn in his homework assignments designed to improve his investment in the treatment philosophy and develop pain management skills. During our last session on 09/06/2007, we once again discussed his goals of pain relief and he was taken aback by the programmatic goals of improving functioning, stating he "needs to think about" whether he could invest in this or not. Mr. Zimmer had missed several sessions across disciplines due to various events, such as his own pain and child illnesses. He missed one psychological session with me. Mr. Zimmer's case manager, Joe Maloney, had discussed with the patient the importance of participation and agreement with treatment goals. Mr. Zimmer unfortunately, during the week of 09/10/2007, again, missed more sessions due to pain, and as a result of his lack of investment in treatment, insurance benefits were discontinued. He is, therefore, discharged with a poor prognosis for functional rehabilitation, as his goals remain strongly for pain relief. Pursuits of pain relief to this point have not proved beneficial. Further treatment would certainly be recommended should he have a change in focus and can fully commit to rehabilitation goals.

(Tr. 328).

On October 5, 2007, Plaintiff was examined by Dr. Leroux. (Tr. 290-92). Plaintiff reported that he was continuing to experience chronic low back pain. (Tr. 290). An examination of Plaintiff's spine revealed tenderness but no paravertebral spasm. (Tr. 291). Straight leg raising was negative. (Tr. 291).

On May 19, 2008, Plaintiff participated in a consultive examination conducted by David Cashbaugh, Jr., a limited license psychologist. (Tr. 429-34). Plaintiff reported that he was

disabled due to "severe and chronic back pain from my neck down to my feet and basically can't sit, stand, walk, or do anything." (Tr. 429). Plaintiff further reported that "he has to take medications just to go out and walk or his back will lock up on him." (Tr. 429). Plaintiff reported that "he cannot tolerate standing or sitting long enough to do anything." (Tr. 430). Plaintiff also reported, however, that he went deer hunting "this past year." (Tr. 431).

The results of a mental status examination were unremarkable. (Tr. 432-34). The examiner observed that Plaintiff "made a lot of grunts and groans" and "moved around frequently in his chair saying he was uncomfortable." (Tr. 433). The examiner also observed, however, that Plaintiff "did seem able to move fairly freely, such as to get in and out of his chair, and squatting down, etc." and that his "posture and gait appeared fairly normal." (Tr. 433). Plaintiff was diagnosed with pain disorder associated with both psychological factors and general medical condition. (Tr. 434). His GAF score was rated as 53.[1] (Tr. 434).

On June 19, 2008, Plaintiff participated in a consultive examination conducted by Dr. Donald Sheill. (Tr. 454-55). Plaintiff reported that he was disabled due to back problems, chronic nerve pain, and depression. (Tr. 454). Plaintiff reported that he "walks about 300 yards with reasonable comfort" and "can sit for 45 minutes or stand for 30 minutes." (Tr. 454). Plaintiff also reported that he recently "gained custody of his four year old child" who "keeps him busy since he drives him around, etc." (Tr. 454). An examination of Plaintiff's spine revealed:

> The spine is straight without deformity and he has a small surgical scar. He exhibits blotchy purple discoloration of the skin consistent

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 53 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

11

> with excessive heat application. Tenderness is minor and axial loading is virtually negative. SLR causes pain in the ipsilateral buttock and back. Seated and supine are not consistent. Sensory appears altered over the entire left calf and lateral foot and to a slight degree over the right lateral calf and lateral foot. There is no atrophy. [Plaintiff] appears uncomfortable getting out of the chair and has a mildly antalgic gait favoring the left. He has good balance and appears to make a reasonable effort.

(Tr. 455).

The doctor concluded that Plaintiff was experiencing "lumbar pain with sciatica" and that "deconditioning may be contributing as well as extrinsic factors in his life." (Tr. 455). The doctor also reported that Plaintiff was experiencing depression. (Tr. 455). The doctor subsquently completed an addendum to his report indicating the following:

> [Plaintiff] called back a few hours later pointing out that he has ED requiring Viagra use and perhaps twice a month has difficulty controlling stool. He believes that both problems are due to neurologic problems resulting from the back condition. He also wanted to make sure I was aware that he attempted a work hardening program but could not tolerate it.

(Tr. 455).

On July 25, 2008, Plaintiff met with Dr. Thomas Graff. (Tr. 710-11). Plaintiff informed the doctor that he was returning to work because otherwise "Social Services [were] going to cut off his supplements." (Tr. 711). On August 7, 2008, Plaintiff reported to Dr. Graff that he was "doing better." (Tr. 709).

On October 7, 2008, Plaintiff participated in a nerve conduction study, the results of which were "normal." (Tr. 689-90). Plaintiff also participated in an electromyography examination, the results of which revealed "electrodiagnostic evidence suggesting a previous but resolved L5 radiculopathy." (Tr. 689-90). The same day, Plaintiff participated in an MRI examination of his

12

lumbar spine, the results of which revealed "deformity at L5-S1 on the left consistent with prior operative access and scar formation." (Tr. 691).

On February 8, 2010, Dr. Graff completed a report regarding Plaintiff's residual functional capacity. (Tr. 716-19). The doctor reported that Plaintiff can sit continuously for 45 minutes and stand continuously for 30 minutes. (Tr. 717-18). The doctor reported that during an eight hour workday with normal breaks Plaintiff can sit and stand/walk for less than two hours each. (Tr. 718). The doctor reported that Plaintiff required a job that affords him a sit/stand option. (Tr. 718). The doctor reported that every 45-60 minutes, Plaintiff will need to take a break of 10-15 minutes. (Tr. 718). The doctor reported that during an eight hour workday, Plaintiff should spend 25 percent of the day with his legs elevated on three or four pillows. (Tr. 718). The doctor reported that Plaintiff can occasionally lift/carry 10 pounds, but can rarely lift/carry 20 pounds. (Tr. 718). The doctor reported that Plaintiff can occasionally twist and climb stairs, can rarely stoop or crouch/squat, and can never climb ladders. (Tr. 719). The doctor also reported that during an eight hour work day, Plaintiff could use his upper extremities to perform reaching, handling, or fingering activities only 66 percent of the time. (Tr. 719).

At the administrative hearing, Plaintiff testified he went on a one week deer hunting trip with his father the previous year. (Tr. 50-51). Plaintiff reported that he also went on a five day hunting trip to Iowa with several of his friends. (Tr. 52-53). Plaintiff reported that he can continuously sit for 30-50 minutes, stand continuously for 20-30 minutes, lift ten pounds, and walk 150 yards. (Tr. 54-56). Plaintiff reported that performing his prescribed stretching exercises helps his back, but that he does not perform them on a daily basis. (Tr. 58-60). Plaintiff also reported that in December 2008, he received a Worker's Compensation settlement of more than one-hundred five-

thousand dollars ($105,000.00). (Tr. 39).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the

---

[2] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from a back impairment and a somatoform disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 14-22).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work subject to the following limitations: (1) he can occasionally lift/carry/push/pull 20 pounds and can frequently lift/carry/push/pull 10 pounds; (2) he can stand and walk for 4 hours and sit for 6 hours during a normal work day with normal breaks; (3) he requires a sit/stand option; (4) he can use his hands to perform gross and fine manipulation activities; (5) he can occasionally climb stairs, but can never climb ropes, ladders, or scaffolds; (6) he can occasionally bend, stoop, crouch, crawl, twist, squat, and balance; (7) he can have only limited exposure to hazards such as uneven surfaces, heights, and dangerous machinery; (8) he can concentrate and understand simple instructions; (9) he can perform simple tasks; (10) he can get along with others and respond appropriately to supervision; and (11) he can adapt and respond appropriately to workplace changes. (Tr. 22).

The ALJ concluded that Plaintiff was unable to perform any of his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to

question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Wallace Stanfill.

The vocational expert testified that there existed approximately 16,400 jobs in the state of Michigan, and approximately 665,000 jobs in the national economy, which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 62-64). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

I.      **The ALJ Properly Evaluated the Medical Evidence**

As noted above, on February 8, 2010, Dr. Graff reported that Plaintiff was impaired to an extent beyond that recognized by the ALJ. For example, the doctor reported that during an eight hour workday with normal breaks Plaintiff can sit and stand/walk for less than two hours each. The doctor reported that every 45-60 minutes, Plaintiff will need to take a break of 10-15 minutes. The doctor reported that Plaintiff should spend 25 percent of his workday with his legs elevated on

16

three or four pillows. Dr. Graff also reported that Plaintiff could use his upper extremities to perform reaching, handling, or fingering activities only two-thirds of the time. The ALJ afforded reduced weight to Dr. Graff's opinion. Plaintiff argues that because Dr. Graff was his treating physician, the ALJ was required to afford controlling weight to the doctor's opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the

ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

As the ALJ noted, Dr. Graff's opinions are not supported by the medical evidence. As detailed above, the objective medical evidence fails to support the argument that Plaintiff suffers from an impairment or condition that limits him to the extent alleged. The ALJ noted that while the record contains no evidence that Plaintiff experiences any impairment to his upper extremities, Dr. Graff nevertheless concluded that Plaintiff's ability to utilize his upper extremities to perform work activities was significantly impaired.

The ALJ also noted that contemporaneous treatment notes (as opposed to the results of examinations directly related to Plaintiff's claim for workers' compensation or disability benefits) do not support the Dr. Graff's opinion that Plaintiff is impaired or limited to the extent alleged. The Court notes that Dr. Graff's contemporaneous treatment notes, likewise, do not support the opinions in question. (Tr. 675-83, 692-719). As also noted above, Plaintiff consistently failed to consistently attend physical therapy, which suggests that Plaintiff is far less limited than Dr. Graff suggests. Finally, Plaintiff's reported activities are inconsistent with Dr. Graff's opinions. In sum, the ALJ's decision to afford less than controlling weight to Dr. Graff's opinions is supported by substantial

evidence. Accordingly, this argument is rejected.

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Date: March 28, 2013                              /s/ Ellen S. Carmody
                                                 ELLEN S. CARMODY
                                                 United States Magistrate Judge